May it please the Court, Mary Ann Dugan for the Plaintiff's Appellant. I would like to reserve five minutes for rebuttal. Sure. Just keep an eye on the clock there. Yes. Thank you. It's frankly hard to know exactly where to start unless you have a specific question, because there are – okay. I would like you to help me make sure I understand the standard of review that I'm supposed to apply at this stage. And here's my understanding. The challenge here is to the granting of a Rule 60B motion to modify or dissolve the district court's prior order that had remanded it to the agency. So do we not review that determination under an abuse of discretion standard? And if so, doesn't our in-bank opinion in Hinkson tell us that the first thing we must do is determine whether or not the district court correctly identified the legal rule that applies, which here is the arbitrary and capricious standard under the APA? And then if so, don't we ask whether or not the district court's conclusion in applying that standard was illogical, implausible, or without support and inferences that may be drawn from the record? Well, I'm guessing you're probably right on that. We did not brief that issue on the standard of review. We are in an unusual situation in that it's a modification of an injunction rather than a direct merits appeal of the original decision, which we're going to review. It makes a difference, doesn't it, because it's before us on a Rule 60B appeal. I don't think it could make a difference because the underlying standard of review is still the arbitrary and capricious rule. That gives us the first prong of Hinkson. That's the correct legal rule that applies. But then the second prong is the one I just summarized for you. Well, but the second prong is swallowed by the first prong because the only way that the the the in order to prove that the lower court was abused its discretion would be if it incorrectly found that the agency's decision was not arbitrary and capricious. Well, are you saying that we review that de novo? Because that's not what our in-bank court said in Hinkson. Well, again, since this wasn't briefed, perhaps we could do a supplemental brief on this issue, a short brief. But there's no case law I'm aware of in the context of NEPA and, I'm sorry, the National Forest Management Act and the APA that allows you, for example, to defer to the district court's findings, so to speak, because they are not findings of fact. This is reviewed on the administrative record. To review, the first question we ask is, did the district court correctly understand what the law was? And I guess you agree with me that APA, arbitrary and capricious. Right. Right. But then the second prong, as our in-bank court dictated, was whether or not the district court's conclusion in granting the government's motion was illogical, implausible or without support in the evidence of record. I have not read the case you are citing, Your Honor. Or if I have, it's been a while. In case you have another one of these. Okay. Thank you. Hinkson. Yes, Your Honors. Judge Bayer opinion. Pardon? Judge Bayer opinion. And a great trial judge, too, I must say. Okay. There is a basic problem here, and it's actually going on in other forests, which is that, you know, back in 1982, when the National Forest Management Act was first implemented, and there was a group of scientists that were put together by con --that were asked to come together by Congress and come up with regulations, and they, in their infinite wisdom as scientists, said, well, you can't go survey every single species on the forest to meet this statutory obligation to protect biodiversity. So how about the idea of management indicator species? For each type of habitat, come up with a species. Each forest should come up with a species that it thinks is the best indicator, a good indicator. And so that then you go out and --. That's the proxy process, right? Well, it's the original, right, the original proxy. And then we have the proxy on proxy. We do know the history. Yes. And I'm not -- I'm just kind of --. And we've approved the proxy on proxy, right, process? Well, yes. So the proxy on proxy took it another step. It was a later development, which said, we're just going to survey the habitat when it's infeasible to go survey for that one management indicator. Because the animals are so hard to find sometimes. They don't stick around to be observed. Correct. And what we really care about is the habitat. So they've got, you know, all the stuff they need to eat and live and thrive. That's really what we care about. And we presume that then they do thrive because of the habitat. So we've said that's okay, right? Yes. In the Lands Council case which you joined, en banc, Your Honor, Judge Kaczynski, the panel, the en banc panel, upheld the proxy on proxy, but also upheld the limits on that approach, saying that that can only be used, this review of habitat instead of species, where number one, the Forest Service's knowledge of what quality and quantity is necessary to support the species is good. And number two, where their methodology for measuring existing amount of habitat is reasonably reliable and accurate. And where we are breaking down here is on every part of this analysis. I'm going to start kind of at the end, which is that in their last breath, the Forest Service argues that, well, you can't look at habitat trends and compare them to the red-breasted nuthatch and the mule deer because those species are limited by things other than habitat. They are limited by the availability of water, and they are limited by forage quality for the deer. And so now we have a situation where the original decision by this forest to pick those species as the indicators is no longer valid because they were selected supposedly because they represent the habitat elements necessary to provide for all the wildlife species within that habitat assemblage. And if you look at that, any changes in population of that indicator species would indicate the health of all the species. Well, if there — So is this your argument that we should have looked at spotted owls and some other species? Your Honor, our argument is that the Forest Service has the duty to come up with species that they believe, through study, are going to best or well indicate the species — the health of the other species. Didn't you argue in the district court for a different choice of species? That was one of our arguments. That, in a footnote, probably. You haven't — you didn't challenge that determination, did you, on appeal? That when the Forest Service rejected it or the district court said no, that that's — they can rely on the mule deer and the red-breasted nuthatch? That is part of our appeal briefing. That in the reply brief, when it became clear in their response brief what they are now arguing, in the reply brief, we did rebut that and say, well, then, you know, this is a sham at this point. You can't — you're not surveying anything. So you want the Article III judges to pick which species is correct? Absolutely not, Your Honor. What we are saying is that the reliance on these species, since the Forest Service has now acknowledged they are not good indicators, must be enjoined unless and until the government comes up with a new species or better studies to show correlation. At that point, that's a new decision. That would be challengeable. But if we go back to the standard of review, as I read the district court's order, it looked at the Forest Service's justification and concluded that these species were representative that the Forest Service could rely on them. Is that correct? The court did make that determination. We're arguing that was an incorrect determination. If we overturn under an abuse of discretion standard, we would have to conclude that that decision is illogical, implausible, and without support in the record. It is, Your Honor. On — for example, although there are three charts in the ER 82 to 85 showing statewide deer trends over the last century and from 1990 — from 1990 to 2008 and in a shorter period on a particular deer unit, there is no chart anywhere that has been pointed to showing trends in the open and early seral habitat in that same location and time period. There's no data that's been pointed to showing any correlation. And that is the guts, the heart of an MIS approach to protecting biodiversity. Similarly — So your argument is that they have to survey in every unit of the forest that they intend to take any action in? Absolutely not, Your Honor. What we're saying is that once they have done their homework, which is do the surveys that show the correlation — it doesn't have to be on the project site — when they have some historical data that actually shows a correlation between deer health and the amount of open and early seral, then they can rely on that. But they have not pointed to any such data. We're talking about less than 5,000 acres in a 2.2 million acre national forest, right? That sounds accurate, yes. So I'm having a hard time understanding why you didn't just argue that it was deficient because they didn't tie it directly to this particular 5,000 acre parcel. It's a much bigger failing than not tying it to this particular parcel. It's a shell game. Did I misunderstand your argument? Because it sure sounded to me like that was what you were saying. That was a very small piece of our argument, that there wasn't a site-specific survey. So should I give that 10 percent of your argument, 5 percent? They went on none of these points, Your Honor, none of them. The standard is arbitrary and capricious. It's — this is an entirely arbitrary and capricious decision. There is no data supporting their assertions that there is some sort of correlation. For example, the deer charts show increase — an increase in deer from 2004 to 2008. That's E.R. 84 to 85. But the Forest Service says open and early seral on that forest is down 15 percent. That's on E.R. 81. I'm sorry. What's down 15 percent? The early and — early seral and open habitat. The habitat that the deer is supposed to be correlated to, there's a negative correlation if you compare the two pieces of data that are in the record. It's not a great bit of data because the habitat data just shows the trend from 1991 to 2007, one number at the beginning and one at the end. They don't show a chart like they do with the amount of deer. The same problem is true with the red residue. Why are you comparing species with habitat? Pardon? Why are you comparing species with habitat? It's entirely possible the species could be up. If the habitat for another species could be down, and yet the other species could be up as well. It was the Forest Service's choice to use habitat as a proxy for the health of the species. That was their choice because they didn't want to have to go survey every species like they were told in 1982 by the regulations that were developed by scientists implementing a statute written by Congress. They don't want to go do that, and they don't have the resources to do that. Who can blame them? But when they come up with an alternative way to do it, which is to survey habitat, this court en banc in Lands Council explained what the limits are on doing that, and they have not met that standard in any way whatsoever. They have not shown any correlation, much less a good correlation, between the species  On the red-breasted nuthatch, I also want to point out that they say that they have done they have gathered current, the most current available monitoring data. But if you look at the data on ER 82 to 85, it's very old data. The charts don't even go past 2000. They are not relying on current data. They haven't done any surveys for deer at all. They've just used historical trend data statewide. Then with the red-breasted nuthatch That was the statewide survey that was done by the California Department of Fish and Game. Yes, Your Honor. Okay. And then your argument was they should have followed the mule deer foundation, right? Oh, absolutely not. I think there's a confusion that we are arguing for one particular expert to be appointed here or something. What we're saying is that Forest Service's duty is to look at all the data, gather that data, and then if they can show a correlation between the habitat health and the species health, then under Lands Council, they are allowed to use that species as a, that habitat as a proxy for the health of the species, which is already a proxy for the health of all the other species in that habitat assemblage. The California Fish and Game, and this is SCR 106, pointed out that there are so many factors affecting the health of mule deer that it's not well correlated to habitat. They pointed out that deer have to compete with livestock for forage. There's predation. There's disease. There's poaching. Deer get hit on highways. You know, so to try to correlate habitat with deer without some better data is not appropriate here. Council, I'm looking at, for example, ER, looks like 83, I think it is, which is the 93, which is the cumulative effects conclusion for the red-breasted nuthatch in the record of, I'm sorry, the final environmental, supplemental environmental impact statement. Isn't, isn't that where the Forest Service basically reaches the conclusion with regard to the correlation? I don't think it's on that page. There is a, there is a statement in the record, ER 57, I believe, that says, if I can read my writing, it might be 51, that there are steady population increases, I see I'm out of my 15 minutes. May I still reserve some time for a rebuttal or? Okay. Well, let me, I will finish answering your question. I apologize. That the red-breasted nuthatch has had steady population increase since the late 90s, and that that parallels an increase in late seral and snag and down log assemblages, but there's no data stated to support that. And when you look at the data, which is spread out in the record, but if you look at the charts on 234 to 235, the numbers are up and down and up and down since the late 90s. And there's no chart showing the amount of late seral habitat anywhere. There's no data that's been pointed to. This is the height of arbitrary and capricious decision-making, Your Honors. Thank you. Thank you. Good morning, and may it please the Court. Kate Bowers from the Department of Justice here today on behalf of the Forest Service. Before we get into questions of methodology, I do just want to remind the Court that the issue here today is actually very narrow. The district court identified defects in the Forest Service's analysis that the plaintiffs had initially complained about. The agency corrected those errors in a supplemental analysis on rename, and those were two very specific issues with respect to the mule deer and the red-breasted nuthatch. And the district court found on a Rule 60B motion that that analysis satisfied what was required and was not arbitrary and capricious. So the district court was well within its discretion in granting the Rule 60B motion. And that motion, as I said, the ruling on that motion just had to do with the mule deer and the red-breasted nuthatch. The district court didn't make a specific finding about what the methodology was, just looked at the mule deer and the red-breasted nuthatch. But just to clarify some issues that came up just now, I want to clarify, first of all, that we're no longer operating under the 1982 rule. This Court has expressly held in multiple opinions that that rule was superseded in 2000 by a new planning rule that no longer expressly requires the identification and the monitoring of management indicator species. If you look at this Court's en banc opinion in Ecology Center v. Castaneda, that makes quite clear that the 1982 management indicator species requirements only apply to the extent they've been incorporated into a governing forest plan. And that simply hasn't happened here. In an unpublished opinion two years ago that is not precedential but still quite illustrative, this Court specifically found that the governing forest plan that applies to this case does not identify any management indicator species or require the monitoring of any management indicator species. So what the appellant has argued with respect to the requirements of the forest plan, either under the language of the plan itself or under any governing planning rule, just aren't the case. We're not in that planning regime anymore. But if the Court doesn't have questions about the methodology, I would like to turn specifically to the analysis of the mule deer and the red-breasted nuthatch. Let me ask a question. What procedure does the government claim was used in making these determinations, like on the two species you mentioned? Your Honor, the supplemental analysis as well as the entire initial EIS was subject to the 2000 planning rule, which required forest planners to consider the best available science. And that's where that last part of the argument comes in, to the best available science requirement. There was nothing required specifically with respect to management indicator species. But I do want to talk specifically about the analysis of the mule deer and the red-breasted nuthatch. These were selected to provide additional context to what formed the primary basis of the Forest Services analysis, which was an analysis of habitat components. So the late serral, the open and early serral, the snag and down log assemblages. And that was permitted under the direct language of this forest plan. The District Court found that these were appropriate species, that they were well established, that they were associated with the habitat assemblages that the Forest Service tied them to. And there's ample support in the record for a correlation between these species and the habitats in which they're found. So specifically with respect to the mule deer, if this Court is curious about what was done differently on remand, I would recommend turning in the record to two sections of the EIS and the supplemental EIS. You can open them up and compare them. It's Chapter 3 and Appendix L. And you'll see it's quite clear that the analysis was much more rigorous and solved the problems that the District Court had identified. With respect to the mule deer, it's not the case that the Forest Service's monitoring data stops at 2000. If I remember correctly, the Forest Service cites Department of Fish and Game Studies with data that run all the way through 2009. So there is data that's quite up to date. That population increase from 2004 to 2008, the Forest Service specifically analyzed and found that read within the context of larger population trends that were tracked from the 1990s on, or actually from the 1970s on, I believe, that there was still a steady decline in the mule deer populations that tracked a steady decline in the availability and quality of forage habitat. So that comes out of more current monitoring data. It comes out of... Council, I asked your opponent, and since we're talking about mule deer, I'll refer you to ER 80, the cumulative effects to the habitat. Is that the Forest Service's conclusion as a result of what the District Court told them that they had to do on remand? This would be part of the, as I read it, the final supplemental environmental impact statement. Your Honor, I believe that the cumulative effects of habitat analysis was included in both the EIS and the supplemental EIS. That's a habitat analysis specifically. What the District Court's concerns related to were the population analysis. Well, I guess then my question is, is this whole section starting at ER 75 through, I think, ER 87 is the work that was done on remand? Yes, that's correct. There's also additional analysis on pages 143 to 150. So as you can see, it's quite extensive analysis that doesn't simply repeat what was done in the initial EIS. There was extensive discussion. There was an exhaustive literature review, including studies both by the Department of Fish and Game, which is regarded as the expert. They have the most data of any organization in the state in terms of actually conducting population counts, and reviewed that literature, reviewed some of the literature that's been cited by the appellants, and clarified the causation of population decline, which was an issue raised at the District Court summary judgment opinion, clarified that predation is simply a symptom of underlying habitat pressure. And that's amply supported in the data and in the reports and studies that are described in here. The District Court was satisfied by that. There was no requirement, either in the District Court's order or by any part of the Forest Plan, to add in new data or to conduct any kind of population surveys. In fact, better analysis of the same data would have been sufficient, although the Forest Service did elect to add in additional information here. I just wanted to clarify also that the level of controversy that's identified in the scientific literature by the appellant is actually overstated. Even the Mule Deer Foundation has identified habitat loss and habitat quality as a significant issue affecting mule deer populations. Just to turn to the red-breasted nuthatch, the District Courts had a similar concern there in terms of the correlation between habitat and population and found that on remand the Forest Service had resolved that concern by using additional information, used an analysis of population trends and habitat on a broader scale to counteract the limitations that the But even so, the Forest Service undertook two years of project-level population counts in 2008 and 2009 and read in the context of the relevant data from the Breeding Birds Survey, which is also examined in much greater detail in the Supplemental EIS, concluded that local habitat trends are correlated with the actual changes in population, even if those direct observations on a local scale couldn't establish the correlation. The use of Breeding Birds Survey data has been well-established. It's been approved by the District Court. I know that the appellant has identified some instances where reliance on that data has been invalidated by this court. It was very fact-specific. Particularly in this case, the red-breasted nuthatch had the highest credibility rating that the Breeding Birds Survey ascribes, so it was quite reliable data for them and there is no reason to doubt that the local trends tracked any broader trends. I just want to turn very quickly to the best available science requirement. The Forest Supervisor expressly found in the record of decision on remand that the agency had used the best available science. There is extensive discussion in the record of the Forest Service's method. It explained clearly what the method was. It explained why it was focusing on habitat and analyzing habitat to predict the effects of the project. There has been no showing by the appellants that the Forest Service's methods were outdated or that they were flawed. This was an accepted method. It relied on quite a range of scientific studies and there's been no showing that the large-scale direct species monitoring that the appellants desire would be feasible, let alone required under any regulation or any forest plan requirements. And there's also been no showing that the selection of the mule deer and the red-breasted nuthatches species to provide supplemental analysis was not the best available science. Kennedy. I think this is all in your brief. Yeah. If the Court has no further. I have one question. What is the status of the logging on this project? Is it still ongoing? Yes, Your Honor. The project is still ongoing, though it's almost complete. At the district court motion for injunction pending appeal stage, the timber purchasers voluntarily agreed to stay operations on two sale units within one of the three project sales. So with respect to those two units, there have been no operations. With respect to the other sales, the first is 100 percent complete. The second, with the exception of those two enjoined units, there are only two units left with any work remaining. All the cutting has been completed. It's just a question of removing some biomass. I think it's about 5 percent of the biomass unit in the sale. And with respect to the third sale, that's about 75 to 80 percent complete. Thank you. Thank you. Thank you. My understanding is that we have been given 14 days' notice that logging could resume because of the logging season, and we would ask that you consider, reconsider the denied injunction pending appeal, pending a decision. We are talking about a violation of the Forest Plan, not the 1982 regulations, to be clear. That was written. The plan was written based on the 1982 rules, and the defendant admits that in its brief at page 8. The Forest Plan chose the management indicator assemblages, nine wildlife assemblages and three fish assemblages, and they were chosen because they were expected to be good indicators. And the statute still requires the Forest Service to provide for diversity of plant and animal communities. They need to figure out some way to do that, 16 U.S.C. 1604. And these mandatory provisions do apply to site-specific timber sales, as this Court stated in Inland Empire. The California Fish and Game did have data through 2008 statewide. However, the deer charts, the trend charts from 2004 to 2008, which are in the record at 84 to 85, show an increase of deer. And yet the only data we have on the open slash early seral habitat shows a decrease. That's on ER 81. Clearly, logging is going to create more open habitat, more early successional habitat, but the Forest Service insists that the project would not have any measurable impact at all on deer because of these other limiting factors, and that's defendant's brief at page 27. So there's this disconnect between using the deer as an indicator for the using the habitat as an indicator of the health of the deer, which is an indicator of the health of the other species that use that habitat. In defendant's brief at 42, they argued that it was not quantity but quality of deer habitat that is controlling, but they point to no data on the changes in the quality of the habitat. They have no data on how logging would change that quality, make it better or worse. Similarly, regarding the red-breasted nuthatch. Well, let me challenge you on that. Could you turn to ER 97? The supplemental environmental impact statement cites multiple studies at that page that link population decline in the red-breasted nuthatch to a reduction in mature conifer forests and snags. But why isn't that enough to show a habitat-species relationship under the highly deferential standard of review that we must apply? Because the Forest Service themselves now, in their briefing on page 49, say that you can't show any correlation, you can't show an impact of logging on red-breasted nuthatch because they are limited by water quality, water availability, not logging. I mean, look at the language on ER 97. It discusses at some length the impact, does it not? This is the impact on... The red-breasted nuthatch. Which line are you, I'm sorry, where are you looking at? Well, I'm looking at basically at the entire page. It's basically talking about the number of snags that need to be left and, you know, whether or not logging of these forests will leave sufficient habitat for the birds. Right. And then it concludes that it will. These are very generalized statements that say what is obvious, which is that if you remove snags, you're going to hurt species that like to use snags. The Forest Service, and I see I'm out of time. May I briefly conclude my thought on that? The Forest Service is now insisting that there won't be an impact by removing these snags because red-breasted nuthatch rely on other things such as water. And so they're the ones that have confounded the analysis, not the plaintiffs. Thank you, Your Honor. Thank you. The case is light. All those in favor, we are adjourned. Thank you.
judges: Kozinski, Tashima, Tallman